IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| RICKY ALLEN PHILLIPS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:11CV279 |
| | ) | |
| PATRICK R. DONAHOE, | ) | |
| Postmaster General of the United States | ) | |
| Postal Service, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION, ORDER, AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on a Motion for Summary Judgment [Doc. #26] filed by

Defendant Patrick R. Donahoe as the Postmaster General of the United States Postal Service

("Defendant") in this disability discrimination suit. Plaintiff Ricky Allen Phillips, who is

proceeding *pro se*, contends that his employer, the United States Postal Service, failed to

reasonably accommodate his disability and retaliated against him prior to his disability retirement

in July 2009. Defendant has moved for summary judgment on all of Plaintiff's claims, disputing

whether Plaintiff was disabled under the Rehabilitation Act, and further contending that the

Postal Service offered Plaintiff various accommodations, but that the accommodation Plaintiff

requested was not reasonable because it would have resulted in a violation of the Postal Service's

collective bargaining agreement. Plaintiff has responded, and Defendant's Motion is ready for

ruling. Defendant has also filed a Motion to Strike Inadmissible, Unauthenticated Attachments

to Plaintiff's Response [Doc. #38]. For the reasons set out below, the Court recommends that

Defendant's Motion for Summary Judgment be granted, and denies without prejudice Defendant's Motion to Strike.[1]

I.     FACTS, CLAIMS, AND PROCEDURAL HISTORY

Plaintiff Ricky Phillips began working for the United States Postal Service (the "Postal Service") in November 1988. Plaintiff was at all times classified as a Mail Handler Level 4 while employed at the Postal Service. Plaintiff's duties were to load, unload, and move bulk mail.[2] In the present suit, Plaintiff contends that the Postal Service failed to reasonably accommodate his disabilities prior to his disability retirement in 2009. Plaintiff has two prior injuries relevant to his disability contentions in the present case: (1) a knee injury that Plaintiff sustained while in the Navy prior to joining the Postal Service; and (2) an on-the-job back injury that Plaintiff suffered in 2001. Although Plaintiff suffered the knee injury prior to joining the Postal Service, Plaintiff performed the Mail Handler Level 4 position without limitation until May 4, 2001, when he suffered the on-the-job back injury. Plaintiff identifies the on-the-job injury as a lumbosacral strain and right inguinal hernia. (Pl. Am. Mem. [Doc. #6] at 3.) He underwent surgery to repair his hernia in June 2001, and on April 19, 2002, while undergoing physical therapy for that injury, he developed a new pain in the upper back and left shoulder that was diagnosed as a herniated disc. (Id.) Plaintiff underwent surgery for the herniated disc in July 2002. In October 2002, Plaintiff's treating physician, Dr. Schaeffer, wrote that Plaintiff's activities were restricted,

---

[1] The Motion to Strike seeks to strike various attachments to Plaintiff's Opposition to the Motion for Summary Judgment. However, in light of the Court's recommendation that Summary Judgment be granted in any event, the Court need not resolve the Motion to Strike further.

[2] The functional requirements of the Mail Handler Level 4 position include heavy lifting up to 70 pounds, heavy carrying of 45 pounds and over, 8 hours of straight pulling and pushing, repeated bending, and walking and standing for 8 hours. (Def. Mem. Ex. B [Doc. #27-4].)

including "unable to perform his position as mail handler" for an indefinite period. (Pl. Am. Mem. Ex. 8 [Doc. #6-8].) In January 2004, Dr. Elkins, an orthopedic surgeon, performed a "referee examination" on Plaintiff and found that Plaintiff was able to work for 8 hours per day with restrictions on reaching, reaching above shoulder, and lifting. (Id. Ex. 11 [Doc. #6-11].) The restrictions would apply for 6 months, but Plaintiff's maximum medical improvement had been reached. (Id.) In an addendum, Dr. Elkins wrote that "after 6 months and some conditioning, he may be able to advance to regular duty." (Id. Ex. 12 [Doc. #6-12].)

Plaintiff filed worker's compensation claims with the Department of Labor related to these injuries, and those claims were allowed. Based on Dr. Elkins' examination, the Department of Labor requested that the Postal Service provide a "Modified Duty" position for Plaintiff. As a result of this request, the Postal Service offered Plaintiff a modified Mail Handler Level 4 position (Limited Duty), which he accepted on March 30, 2004.[3] (Id. Ex. 14 [Doc. #6-14].) This position consisted of driving a power industrial tractor (forklift) on the workroom floor, prepping flats less than 15 pounds, and scanning CD's and returning them to the manufacturer. (Id.)

Plaintiff began working in this Limited Duty position in 2004, although his medical records indicate that he continued to have extended absences due to his back pain in 2006 and 2007. Plaintiff contends that sometime in 2007, he began experiencing problems obtaining keys

---

[3] Defendant notes that under the applicable collective bargaining agreement, a Postal Service employee injured on the job may be assigned to a "Limited Duty" position, while a Postal Service employee with an injury or illness that temporarily renders them unable to perform their duties may be assigned to a "Light Duty" assignment, regardless of whether the injury was suffered on the job, but the parameters of those positions are determined by collective bargaining agreements. (Def. Mem. Ex. F [Doc. #27-52 at 4].)

to the forklifts, apparently because the forklifts were often already in use or the keys were in the possession of other employees when Plaintiff's shift began. (Pl. Dep. at 80-82 [Doc. #27-2 at 35-37].) Plaintiff contends that because the "newer forklifts" were rarely available, he was forced to use the older "air mail forklift," which "created an animosity between Plaintiff and the airmail room employees." (Pl. Am. Mem. [Doc. #6] at 5.) Plaintiff also contends that the "air mail forklift" caused aggravation to his back and his knee. On January 31, 2008, Clifton Hendrick, Acting Manager Distribution Operations, asked Plaintiff to move some pallets of mail. However, Plaintiff responded that no forklift was available, and Plaintiff declined Mr. Hendrick's suggestion that he use the forklift from the air mail room. In his Complaint, Plaintiff alleges that he asked Mr. Hendrick for a "reasonable accommodation" that would allow Plaintiff to drive one of the "newer forklifts" when one was available, rather than driving the air mail forklift. Plaintiff contends that Mr. Hendrick became angry and told Plaintiff to go "push the buttons" on the Automated Package Parcel Sorting ("APPS") machine. (Pl. Am. Mem. [Doc. #6] at 21-22.) Another supervisor subsequently brought Plaintiff keys to one of the newer forklifts.

On May 1, 2008, Plaintiff filed an EEO complaint regarding this January 31 encounter. In response, the Postal Service asserted that the forklifts were all the same and that Plaintiff himself acknowledged that no employees were assigned to particular forklifts. Nevertheless, on July 4, 2008, and again on July 14, 2008, the Postal Service offered Plaintiff a Modified Assignment (Limited Duty), that would have limited his duties to fork lift driving and scanning labels. However, Plaintiff refused both offers. (Def. Mem. Ex. D ¶ 5, Exs. D.1, D.2 [Doc. #27-

13 through 15].) Plaintiff contends that he did not want to take the chance that work would not be available. (Pl. Dep. at 106-107 [Doc. #27-3 at 2-3].)

On July 24, 2008, one of Plaintiff's physicians completed a Duty Status Report indicating that Plaintiff had been advised to resume work but required back support, and that his standing and walking were limited to 0.5 hours per day as a result of his lower back injury. (Pl. Am. Mem. Ex. 19 [Doc. #6-19].) The Postal Service again offered Plaintiff a Modified Duty position on July 29, 2008, but Plaintiff again refused. (Def. Mem. Ex. D ¶ 5, Ex. D.3 [Doc. #27-13, #27-16].) Plaintiff therefore continued in the same Limited Duty position he had held since 2004 related to his back and shoulder injury.

A few months later, in December 2008, Plaintiff requested to be moved back to Regular Duty and presented a note from his physician, Dr. Shaeffer, removing all limitations and stating that Plaintiff could resume his full-duty, 8-hour day. (Pl. Am. Mem. Ex. 22 [Doc. #6-22].) Plaintiff notes that he requested to be moved to Regular Duty because "it was determined that if I wanted to stay on the job, I would have to come off restrictions." (Pl. Am. Mem. [Doc. #6] at 11.) Specifically, Plaintiff contends that, as part of the Postal Service National Reassessment Process, he had been notified that there was not enough work to maintain his Limited Duty Position, and that he therefore might be subject to placement, according to Plaintiff, "with companies like Wal-Mart and McDonald's." (Pl. Dep. at 68-72 [Doc. #27-2 at 23-27]; Pl. Am. Mem. Ex. 21 [Doc. #6-21].)[4] Plaintiff contends that he therefore requested Regular Duty,

---

[4] Defendant notes that this National Reassessment Process involved review of limited duty assignments and referral back to the Office of Worker's Compensation for those employees that could not be provided with productive and necessary work within their medical restrictions. While receiving compensation from the Office of Worker's Compensation, the individual could be placed in the Office of Worker's Compensation Vocational

although he states that he believed that Defendant would still accommodate his prior restrictions and/or allow him to return to his Modified Duty position if necessary. In any event, there is no dispute that shortly after receiving the notice, Plaintiff requested that he be moved out of the Limited Duty position and then presented the statement from his physician indicating that he could perform regular duties without restriction.

As a result of this request and medical statement, Plaintiff was moved out of the Limited Duty position and into a regular Mail Handler 4 position, with responsibility on the "Small Parcel and Bundle Sorter" ("SPBS") machine. However, in January 2009, Plaintiff noticed junior employees doing forklift work and met with Union President Theresa Mosberg and filed a grievance with the Union. According to Plaintiff, the Union representative told Plaintiff that the junior employees were volunteering to do the forklift work, and Plaintiff complained that he was not in the "APPS area" where he could volunteer to do the forklift work because he had been placed on a job on the SPBS machine outside of his assigned area. (Pl. Dep. at 112 [Doc. #27-3 at 8].) Plaintiff's supervisor and the Union representative ultimately reached a settlement of that grievance that provided that pursuant to the applicable bargaining agreement, mail handlers would be moved out of their assigned areas by "juniority" and that Plaintiff, as the senior Mail Handler 4 in the Automated Package Parcel Sorter ("APPS") operation, should not be moved from the "APPS area" unless the entire operation was suspended. (Def. Mem. Ex. D [Doc. #27-13 at 4]; Ex. D.6 [Doc. #27-19].)

---

Rehabilitation Program for development of a rehabilitation plan that could include job training or placement with a new employer. (Def. Mem. Ex. F [Doc. #27-52 at 3-5].)

As a result of this settlement of his Union grievance, and his request that he be moved out of the Limited Duty position, Plaintiff was assigned to a regular Mail Handler 4 position in the APPS operation. However, Plaintiff began experiencing physical difficulty with his knee upon his return to full duty, and began to accumulate multiple absences as a result. Plaintiff also contends that medication he was taking exacerbated his mental and emotional conditions, including anxiety, panic attacks, and depression.

On January 26, 2009, Plaintiff gave a note to his supervisor, Ms. Shamsid-deen, asking generally for a "reasonable accommodation." (Pl. Am. Mem. Ex. 26 [Doc. #6-26].) The Postal Service requested additional medical information, and on January 30, 2009, Plaintiff obtained a note from Dr. Schaeffer stating that Plaintiff could not work full duty, but could work an 8-hour day with restrictions. The restrictions requested were to allow him to drive a forklift until his knee was better "in 2-4 weeks," then resume full duty. (Pl. Am. Mem. Ex. 27 [Doc. #6-27].) Plaintiff submitted another note from Dr. Schaeffer dated February 10, 2009, noting that Plaintiff is "troubled by [right] knee pain," that he should be "allowed to do the forklift job," that the duration was "uncertain," and that Plaintiff "cannot stand for long periods of time." (Pl. Am. Mem. Ex. 37 [Doc. #6-37].)

In February and March 2009, the District Reasonable Accommodation Committee (DRAC) considered Plaintiff's requests for accommodation and looked into the possibility of returning Plaintiff to his prior Limited Duty position. The request for accommodation was initially denied based on a finding that Plaintiff's knee condition was temporary, but the DRAC allowed Plaintiff's request for reconsideration and then held an interactive telephone meeting

7

with Plaintiff. As a result of this process, the DRAC contacted Plaintiff's supervisor to determine the availability of his prior Modified Duty position that he had held based on his hernia and back injury. (Def. Mem. Ex. D [Doc. #27-13 at 5-8]; Ex. D.17 [Doc. #27-30].)

However, after further investigation, the Postal Service determined that driving a forklift was not Plaintiff's "contractual bid position," that 8 hours of forklift work was not available, and that allowing Plaintiff to work full time on the forklift would violate the labor contract with the Mailhandler's Union. In this regard, Supervisor Shamsid-deen concluded that she did not have authority to grant the request and forwarded the request to Keith Lawrence, Manager of Distribution Operations. Manager Lawrence concluded that a forklift operator position was not sustainable for 8 hours, that the APPS equipment operator was a Level 5 position based on seniority, higher than Plaintiff's Level 4 position, and that providing the accommodation requested would conflict with these seniority provisions and would violate the labor agreement. (Def. Mem. Ex. B [Doc. #27-4 at 5-6]; Ex. D [Doc. #27-13 at 2, 7-8], Ex. D.19 [Doc. #27-32].)[5] Therefore, the Postal Service concluded that Plaintiff's specific request–that he be given a full time position driving a forklift–could not be accommodated without violating the Collective Bargaining Agreement.

Plaintiff continued to be absent on multiple occasions during this time. Defendant contends that Plaintiff did not provide medical documentation for these absences, and Plaintiff received warnings and discipline in February 2009 and in March 2009 regarding his irregular

---

[5] Plaintiff's initial EEOC complaint and later e-mails from Supervisor Shamsid-deen indicate that Plaintiff had filed a grievance demanding Level 5 pay while driving the forklift, even though he was a Level 4 Mail Handler. (Pl. Am. Mem. Ex. 15, 21, 23 [Doc. #6-15, #6-21, #6-23].)

attendance, including a seven-day "no time off" suspension. (Def. Mem. Ex. D [Doc. #27-13 at 9-10].) On April 8, 2009, Plaintiff was offered a "Light Duty" assignment through May 8, 2009, which he accepted, although Plaintiff contends that he accepted this assignment "under duress" so he would not have to go home. (Pl. Am. Mem. Ex. 30 [Doc. #6-30].) Plaintiff's supervisor sought additional medical documentation from Plaintiff in order to provide him with more Light Duty assignments, but no additional medical documentation was provided and Plaintiff was returned to his Mail Handler 4 position. (Def. Mem. Ex. D [Doc. #27-13 at 10].)

Subsequently, on May 13, 2009, Plaintiff requested that he be assigned to the SPBS machine. However, that request was refused because pursuant to the settlement of his January 2009 union grievance, Plaintiff was not to be moved from the "APPS area" unless the entire operation was suspended. (Pl. Am. Mem. Ex. 33, 41 [Doc. #6-33 at 5; #6-41].) Plaintiff contends that this was "retaliation" because he was told by the union representative that if he had not filed the grievance, the requirement that he stay in the "APPS area" never would have been put in place. (Pl. Am. Mem.[Doc. #6] at 6-7 ; Pl. Dep. at 132-133 [Doc. #27-3 at 28-29].)

On May 21, 2009, Plaintiff requested that he be allowed to sit while he worked at the APPS machine. Plaintiff contends other employees sat in chairs and that he requested an accommodation. (Pl. Dep. at 136-138 [Doc. #27-3 at 32-34].) Supervisor Brenda Morrison told him that he should submit his request in writing to the Agency Nurse. Defendant notes that Ms. Morrison offered Plaintiff the option of working at the "torn and damaged" mail table to provide relief to Plaintiff's knees, or the option of providing medical documentation and requesting a Light Duty assignment. Plaintiff chose to go home on sick leave. (Morrison Decl.

9

[Doc. #35].) On June 18, 2009, Plaintiff filed a formal EEO Complaint, alleging discrimination and retaliation.

On August 25, 2009, Plaintiff obtained a note from Dr. Shaeffer, noting that the prognosis for Plaintiff's knee was poor, and that he did not expect Plaintiff to be able to work in the future. (Pl. Am. Mem. Ex. 34 [Doc. #6-34].) On September 1, 2009, Plaintiff filed a claim for disability retirement, which was allowed, effective July 28, 2009. (Def. Mem. Ex. F.5, F.6 [Doc. #27-57, #27-58].) Plaintiff has been collecting disability retirement benefits since that time. In early 2011, the EEOC issued final decisions finding no discrimination or retaliation, and Plaintiff thereafter filed the present suit pursuant to the Rehabilitation Act of 1973, 29 U.S.C.A. § 794(a) (West 2008 & Supp. 2012).[6] Plaintiff's claims, based on his Complaint and Amended Memorandum in this case, appear to be: (1) that Defendant failed to reasonably accommodate his disability in January 2008 when Manager Hendrick refused his request to be assigned a "newer" forklift and failed to engage in the "interactive process;" (2) that Defendant failed to reasonably accommodate his disability in early 2009, after he had returned to Regular Duty, by failing to provide him with a full-time "forklift" position, by requiring medical documentation, and by failing to engage in the "interactive process," (3) that Defendant failed to reasonably accommodate him by refusing to allow him to sit while at the APPS machine; and

_____

[6] Although Plaintiff attempts to state claims pursuant to both the Rehabilitation Act and the Americans with Disabilities Act ("ADA"), as an employee of the United States government he may only proceed under the Rehabilitation Act. Brown v. Henderson, 6 F. App'x 155, 156 (4th Cir. 2001). However, the Rehabilitation Act specifically incorporates relevant provisions of the ADA. In addition, in his second EEOC complaint (Pl. Am. Mem. Ex. 32[Doc. #6-32]), Plaintiff alleged that he was also the victim of race discrimination because he was "the only white man in my pay location, other black employees are allowed to use chairs." Plaintiff in his deposition also said that his supervisor Ms. Shamsid-deen, discriminated against him based on race, although he stated that he could not prove that. (Pl. Dep. at 134-35 [Doc. #27-3 at 30-31].) However, it appears that Plaintiff has since disclaimed any intent to pursue any race discrimination claims in this case. (Pl. Opp. [Doc. #33] at 2.)

10

(4) that Defendant retaliated against him by ridiculing him for requesting accommodation, by refusing to move him from the APPS machine following his union grievance, and by requiring medical documentation for his leave requests. Plaintiff also appears to contend that his disability retirement amounts to a discriminatory "constructive discharge." Defendant moves for summary judgment all claims.

## II.   DISCUSSION

### A.   Standard

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in a light most favorable to the non-moving party. Id. The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson, 477 U.S. at 247-48). A mere scintilla of evidence supporting the non-moving party's case is insufficient to defeat a motion for summary judgment. See, e.g., Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994); see also

11

Anderson, 477 U.S. at 248 (noting that a non-moving party may not rest upon mere allegations or denials.)

B.     Disability Discrimination

The Rehabilitation Act provides that:

> No otherwise qualified individual with a disability in the United States, as defined in [29 U.S.C. § 705], shall, solely by reason of her or his disability, be excluded from the participation in, be denied benefits of, or be subjected to discrimination . . . under any program or activity conducted by . . . the United States Postal Service.

29 U.S.C.A. § 794(a).

The "ADA and Rehabilitation Act generally are construed to impose the same requirements due to the similarity of the language of the two acts." Baird ex rel. Baird v. Rose, 192 F.3d 462, 468 (4th Cir. 1999); see 29 U.S.C.A. § 794(d) (standards used in determining whether there was a violation of section 794 "shall be" the standards applied under certain provisions of the ADA).

To establish a prima facie case of discrimination by failure to accommodate, a plaintiff must show that: (1) he was an individual with a disability within the meaning of the Act; (2) his employer had notice of his disability; (3) with reasonable accommodation he could perform the essential functions of the position; and (4) his employer refused to make such accommodations. Rhoads v. F.D.I.C., 257 F.3d 373, 387 n.11 (4th Cir. 2001); Haneke v. Mid-Atlantic Capital Mgmt., 131 F. App'x 399, 400 (4th Cir. 2005).

With respect to the first prong of this analysis, an individual is disabled under the Act if he: (1) has a physical or mental impairment which substantially limits one or more of his major

life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. Pollard v. High's of Baltimore, Inc., 281 F.3d 462, 467 (4th Cir. 2002). On September 25, 2008, Congress enacted the ADA Amendments Act of 2008 ("ADAAA"), which became effective January 1, 2009.[7] Post-ADAAA, the regulations specify that "substantially limits" is to be "construed broadly in favor of expansive coverage" and "is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i). Under these regulations, an impairment "need not prevent, or significantly or severely restrict, the individual from performing a major life activity" to be substantially limiting. Id. § 1630.2(j)(1)(ii). In addition, an impairment meets the definition of "substantially limits" under the Act if it is "episodic or in remission . . . [and] would substantially limit a major life activity when active." 29 C.F.R. § 1630.2(j)(1)(vii). Moreover, the regulations emphasize that the "primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity." Id. § 1630.2(j)(1)(iii).

During his deposition, Plaintiff described his disability as: (1) 30% disability in his right knee; (2) 2% disability in his left knee; (3) 9% disability in his neck, but worse since this finding was made; (4) pain in lower back; (5) tendinitis in right elbow; and (6) anxiety and migraine headaches. (Pl. Dep. at 100 [Doc. #27-2 at 55].) Plaintiff testified to additional health problems after he left the Postal Service, including ruptured disks in his neck, such that he believed he could not perform any of the mail handler duties at the time of his deposition in February 2012.

---

[7] Although not retroactive, the ADAAA amendments apply to the extent that allegations are based on events after January 1, 2009. Reynolds v. American Nat'l Red Cross, 701 F.3d 143, 151-52 (4th Cir. 2012).

13

(Pl. Dep. at 62 [Doc. #27-2 at 17].) According to Plaintiff's deposition testimony, the recent aggravation to his neck and back is being handled as an extension of his prior worker's compensation claim. (Pl. Dep. at 156, 161 [Doc. #27-3 at 52, 57].)

Defendant contends that Plaintiff is not disabled because in his deposition Plaintiff testified that he enjoys activities including fishing, nature walks, hiking, and yard walks. In this regard, Plaintiff did testify to fishing, hiking, and work in his yard, although the testimony also reflects that he had gone on a "hike" on an even grade with his 13-year-old niece for 30 minutes, that he took care of yard work once a week for 45 minutes, and that he enjoyed walking around his yard, but that he could not do these activities without pain. (Pl. Dep. at 32, 41, 103 [Doc. #27-1 at 33, 42; Doc. #27-2 at 58].) In addition, Plaintiff presented medical records from 2005 through 2008 indicating that Plaintiff's back pain precluded him from working at all for extended periods of time. Plaintiff also presented a July 2008 physician's statement opining that Plaintiff could spend only 0.5 hours per day standing or walking as a result of his lower back injury. (Pl. Am. Mem. Ex. 19 [Doc. #6-19].) As discussed above, Plaintiff subsequently submitted a doctor's note removing these restrictions on December 2, 2008, and specifically providing that Plaintiff could return to "full duty" without restriction. (Pl. Am. Mem. Ex. 22 [Doc. #6-22].) However, after returning to Regular Duty, Plaintiff presented new evidence regarding his knee injury and related restrictions. In this regard, Plaintiff presented evidence to establish that on February 10, 2009, Dr. Schaeffer, Plaintiff's treating physician, noted that the knee injection given to Plaintiff on his last visit "helped" and that his right knee was doing "a little better," but still "particularly painful when he stands on it for a long time at work." (Pl.

14

Am. Mem. Ex. 39 [Doc. #6-39 at 7].) On February 18, 2009, Dr. Schaeffer saw Plaintiff for "chronic right knee pain." Plaintiff had "tried to go back to work for a couple of days and the pain flared up." Plaintiff was unable to go to work that day, and Dr. Schaeffer took Plaintiff "out of work February 12, 2009 to February 20, 2009." (Id.) On March 26, 2009, Dr. Schaeffer saw Plaintiff for right knee pain (history of meniscal tear with surgery) which had flared up after a couple of hours back at work. Dr. Schaeffer prescribed Oxycodone. Dr. Schaeffer noted he would keep Plaintiff out of work from March 17 through March 22. (Id. at 8.) On June 3, 2009, Dr. Schaeffer saw Plaintiff due to pain in his right knee. Plaintiff was unable to go to work that week. Dr. Schaeffer noted he would keep Plaintiff out of work from June 1 through June 6. (Id. at 9.) On August 3, 2009, Dr. Schaeffer noted that he agreed with Plaintiff applying for disability through work because the doctor did "not think he is going to work much in the future much [sic] with this knee." Dr. Schaeffer prescribed Percocet for Plaintiff. (Id. at 10.) Further, with respect to his knee, Plaintiff testified that his knee sometimes "pops out" and prevents him from standing, and that sometimes it will "pop right back" but other times it will take two or three days to resolve. (Pl. Dep. at 64, 101 [Doc. #27-2 at 19, 56].) Based on these injuries, Plaintiff was determined to be "totally disabled for useful and efficient service in position" and was approved for disability retirement. (Def. Mem. Ex. F.6 [Doc. #27-58].) Given the circumstances, the Court will assume that Plaintiff has made a sufficient showing that he was disabled under the post-ADAAA standard to survive summary judgment.[8]

---

[8] In light of the Court's ultimate conclusion, the Court will assume that Plaintiff has established a disability and will not divide Plaintiff's allegations between pre- and post-ADA Amendment claims. However, the Court notes that Plaintiff's claim of a failure to accommodation in January 2008 would be governed by the pre-ADAAA standard, while Plaintiff's remaining claims are all based on events after January 1, 2009.

The record also supports the conclusion that the Postal Service had notice of Plaintiff's disability. Defendant concedes that it knew of Plaintiff's work-related disability from 2001 through his return to full duty in 2008. In addition, Defendant concedes that it was aware of Plaintiff's military-related knee injury and his subsequently submitted work limitations as set out in Dr. Schaeffer's notes submitted in 2009. (Def. Mem. [Doc. #27] at 14.)

The remaining prongs of the test for showing discrimination by failing to accommodate are whether, with reasonable accommodation, Plaintiff could perform the essential functions of his position and whether his employer refused to make such accommodations. Defendant argues that Plaintiff cannot show that he was able to perform the essential functions of his position with reasonable accommodation and cannot show that the Postal Service failed make such an accommodation. (Def. Mem. [Doc. #27] at 15-16.)

As previously noted, Plaintiff raises three claims based on alleged failure to accommodate: (1) that Defendant failed to reasonably accommodate his disability in January 2008 when Manager Hendrick refused his request to be assigned a "newer" forklift and failed to engage in the "interactive process;" (2) that Defendant failed to reasonably accommodate his disability in early 2009, after he had returned to Regular Duty, by failing to provide him with a full-time "forklift" position, by requiring medical documentation, and by failing to engage in the "interactive process," and (3) that Defendant failed to reasonably accommodate his disability in May 2009 by refusing to allow him to sit while at the APPS machine.

With respect to the January 2008 incident, Plaintiff in his Complaint and Memorandum alleges that he should have been assigned a "newer" forklift because the air mail forklift

aggravated his medical conditions because of less leg and head room, while the newer forklifts did not aggravate his condition. However, during his deposition, when asked to explain how Mr. Hendrick failed to accommodate his disability in January 2008, Plaintiff testified that he wanted a reasonable accommodation "to be allowed to have a forklift there for [him] every day so that [he] didn't have to spend sometimes hours walking around trying to find somebody that would give [him] a forklift." (Pl. Dep. at 98 [Doc. #27-2 at 53].) Plaintiff wanted "a forklift assigned to [his] section for [his] use." (Id.)

In considering this claim, the Court notes that there is no dispute that during 2008, Plaintiff had been provided with a Modified Duty position at the request of the Department of Labor as a result of his worker's compensation claim. To the extent Plaintiff contends he should have been assigned a specific forklift, there is no evidence that anyone was assigned a specific forklift or that such a request was reasonable, given the number of people who all shared the forklifts. (See Pl. Dep. at 83-85, 93-97 [Doc. #27-2 at 38-40, 48-52]; Def. Mem. Ex. B [Doc. #27-4 at 4-5].) Moreover, to the extent Plaintiff complains about specific events on January 31, 2008, it is undisputed that on that occasion Plaintiff was not ultimately required to drive the air mail forklift, and another supervisor brought him keys to a newer forklift.[9] Finally, the Court notes that in response to Plaintiff's additional requests for accommodation in 2008, Defendant made multiple Limited Duty offers to Plaintiff in July 2008, which Plaintiff refused. Having considered the evidence presented, the Court concludes that Plaintiff has failed to present

---

[9] In addition, Manager Hendrick notes that he subsequently offered to assign a forklift to the section where Plaintiff worked, but Plaintiff declined this offer because he wanted a forklift assigned specifically to him. (Def. Mem. Ex. B ¶ 8 [Doc. # 27-4 at 6].)

sufficient evidence to support a claim that Defendant failed to reasonably accommodate his alleged disability in 2008.

Plaintiff next contends that Defendant failed to reasonably accommodate his disability in early 2009, after he had returned to Regular Duty, by failing to provide him with a full-time "forklift" position, by requiring medical documentation, and by failing to engage in the "interactive process." In considering these contentions, the Court notes that it is undisputed that the functions of Plaintiff's Mail Handler Level 4 position included unloading mail from trucks, separating and delivering mail, placing empty sacks on racks, dumping mail from sacks, removing filled sacks from racks, cancelling stamps, operating cancelling machines, operating copy equipment, operating forklifts, rewrapping parcels, cleaning and sweeping work areas, and guarding the postal buildings. (Id., Ex. B ¶ 3.) The functional requirements of the position discussed above show that the position requires heavy lifting and carrying and extended periods of standing or walking.

Plaintiff testified during his deposition that at the time he left the employ of the Postal Service he could not perform the duties of a mail handler. (Pl. Dep. at 63-66 [Doc. #27-2 at 18-21].) He stated that he could not perform those duties beginning "around the end of 2008 and the beginning of 2009." (Id. at 64 [Doc. #27-2 at 19].) He testified that he could not perform these duties because of his knee impairment in addition to concentration problems. (Id.) Plaintiff testified, however, that he could perform such duties if he had been allowed to resume his forklift duties that he held from 2004 until 2008. (Id. at 66-67 [Doc. #27-2 at 21-22].) He agreed, however, that the mail handler position required more than only driving a forklift. (Id.)

18

Given this evidence, Plaintiff has not shown that with reasonable accommodation he could perform the essential functions of the mail handler position. He contends that with reasonable accommodation he could drive a forklift, however if he had to perform other functions of the mail handler position it would cause "a great amount of pain." (Id.) The Postal Service has also shown that an 8-hour day of driving a forklift was not a position at Plaintiff's grade level that was available on the tour of duty that Plaintiff was assigned. (See Def. Mem. Ex. D ¶ 18 [Doc. #27-13 at 8].) In order to reasonably accommodate an employee, an employer is not required to "reallocate essential job functions or assign an employee 'permanent light duty.'" Crabill v. Charlotte Mecklenburg Bd. of Educ., 423 F. App'x 314, 323 (4th Cir. 2011). An employer is also not required to violate a collective bargaining agreement to accommodate an individual absent special circumstances. See U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 403 (2002) ("The lower courts have unanimously found that collectively bargained seniority trumps the need for reasonable accommodation in the context of the . . . Rehabilitation Act.") (citing cases including Carter v. Tisch, 822 F.2d 465, 469 (4th Cir. 1987) ("duty to reassign [a postal worker] would not defeat the provisions of a collective bargaining agreement unless it could be shown that the agreement had the effect or the intent of discrimination")). Although Plaintiff had previously held a Modified Duty position, he had returned to Regular Duty after he received notice that he could not remain in that position. Plaintiff has not presented any evidence to establish that providing the accommodation he requested would not violate the collective bargaining agreement as Defendant contends. Therefore, Plaintiff cannot establish that

19

Defendant was required to provide him with such a position to accommodate his alleged disabilities.

In addition, it is clear from Plaintiff's evidence that Defendant offered him various options in response to his request for a reasonable accommodation, including "light duty" assignments and the option to work at the "torn and damaged" table to rest his knee. Thus, the undisputed evidence reveals that Defendant did attempt to accommodate Plaintiff's alleged disabilities. In addition, it is undisputed that after Plaintiff submitted a written request for accommodation, his request was considered and evaluated by a committee and multiple supervisors, with a reconsideration at Plaintiff's request, to determine if his requested accommodation could be made, clearly reflecting the "interactive process" contemplated by the statute.[10] As part of this process, Defendant was entitled to ask Plaintiff to provide medical documentation and information in order to determine the nature and extent of his restrictions and to attempt to determine what accommodations could potentially be provided, particularly in light of the conflicting medical information Plaintiff had provided in the prior weeks. Therefore, Plaintiff has failed to present sufficient evidence to support a Rehabilitation Act claim based on any alleged failure to engage in the interactive process or based on the requirement that he provide medical documentation to support his request.

Finally, Plaintiff contends that Defendant failed to reasonably accommodate his disabilities on May 21, 2009, when, because of knee and back pain, he sat down in a chair while working on the APPS machine. (Pl. Opp. [Doc. #33] at 17.) According to Plaintiff, Plaintiff's

---

[10] Moreover, it is well-settled that "an employee cannot base a reasonable accommodation claim solely on the allegation that the employer failed to engage in an interactive process." Crabill, 423 F. App'x at 323.

supervisor, Tim Brooks, told him that Brenda Morrison "told me to tell you to get rid of the chair." (Id.) Plaintiff contends that he asked Brenda Morrison that he be allowed to sit in the chair as a reasonable accommodation, but that she told him he would need to submit a written request to the nurse. To the extent he needed to be seated, Ms. Morrison offered Plaintiff duties sitting at the "torn and damage" table, but he declined this offer. Defendant notes that "[n]o other postal employees would sit to do these APPS duties" and that the only place one would sit would be when they were making labels for containers and that would account for only about 10 minutes. (Morrison Decl. [Doc. #35] ¶ 3.) Plaintiff has presented a statement of Tim Brooks stating that there were chairs around the APPS machine and that other employees all over the building used chairs on occasion. (Pl. Opp. Ex. 46 [Doc. #33-1 at 112].) However, Plaintiff fails to show that any specific person was allowed to sit while doing the same job he was doing on the APPS machine. In the circumstances, giving Plaintiff the choice of either (1) making a formal request to the nurse to sit at the APPS machine as a "reasonable accommodation," or (2) alternatively, sitting at the "torn and damaged" table instead, would not reflect a failure to accommodate Plaintiff.[11]

Therefore, Plaintiff's allegations that the Postal Service failed to provide him with a designated forklift in 2008, or failed to provide him with a position that would allow him to drive the forklift full-time after he had returned to Regular Duty in 2009, or failed to engage in an

---

[11] For the same reason, the evidence would not establish that giving Plaintiff this option was a "materially adverse" action against him in retaliation for prior EEO Complaints. In addition, to the extent Plaintiff initially attempted to state a claim for race discrimination based on this incident, he has failed to present any evidence to establish that this incident was an adverse employment action or that he was otherwise discriminated against on the basis of his race.

interactive process with him to resolve his requests for reasonable accommodation, do not constitute a failure to reasonably accommodate. As discussed above, the undisputed evidence establishes that Defendant made multiple attempts to accommodate Plaintiff's disability over an extended period of time, and Plaintiff has failed to raise a genuine issue of material fact on the issue of whether the Postal Service discriminated against him by failing to reasonably accommodate his disability. Summary judgment should be granted to Defendant on this issue.

C.     Retaliation

Plaintiff also asserts a claim for retaliation. To state a prima facie case of retaliation, Plaintiff must show: (1) engagement in protected activity; (2) materially adverse action; and (3) a causal link between the protected activity and the adverse action. Coleman v. Maryland Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010). In this case, Plaintiff contends that Defendant retaliated against him by ridiculing him for requesting accommodation and by refusing to move him from the APPS machine following his union grievance. Plaintiff also contends that his supervisor "harassed" him about his leave requests and his accommodation requests after he filed an EEO Complaint.

To the extent this retaliation claim is based on Plaintiff's interaction with Manager Hendrick in January 2008, Plaintiff has failed to establish any materially adverse action. Although Plaintiff contends that Hendrick "yelled" at him or "ridiculed" him after he requested a forklift other than the air mail forklift, it is undisputed that Plaintiff was not required to use the air mail forklift that day, and it is undisputed that Defendant made multiple subsequent

22

Limited Duty offers in an effort to address his requests for a reasonable accommodation. The single incident described by Plaintiff does not establish a claim for retaliation.

Plaintiff also contends that he was retaliated against as a result of his union grievance. In this regard, Plaintiff cites as his protected activity the union grievance he filed in January 2009, complaining that more junior Level 4 employees were being allowed to drive forklifts. He alleges that he was retaliated against on May 13, 2009, when he requested of Ms. Shamsid-deen to be put on the SPBS machine because of pain and inflammation in his right knee and back pain. Plaintiff alleges that she refused based on the agreement she entered into with Ms. Moberg, the local union president, to settle the union grievance filed by Plaintiff. (Pl. Opp. [Doc. #33] at 15-16.) In considering this claim, the Court notes that Plaintiff has not established that the filing of the union grievance was a protected EEO activity. Moreover, Plaintiff does not dispute that Ms. Shamsid-deen was abiding by the settlement agreement, made approximately four months before, when she refused to allow Plaintiff to work on the SPBS machine. He contends that this agreement worked against him and violated his job description. However, the agreement was entered into on his behalf by the union president to enforce the provisions of the collective bargaining agreement in response to Plaintiff's union grievance. The remark made by Ms. Moberg does not show any intent to retaliate against Plaintiff based on a disability or based on a protected EEO activity; instead it was a true statement that if Plaintiff had not filed the earlier union grievance, there would have been no resulting settlement agreement.

23

Plaintiff also alleges that on February 14, 2009, Ms. Shamsid-deen sent an email to several supervisors and managers regarding Plaintiff. She said in the email, referring to Plaintiff, that "This employee should have be[en] out the door - because of the mishandling of his case prior to me. Since I became his supervisor I have been clearing up and staying on top of his situation." (Pl. Am. Mem. Ex. 21 [Doc. #6-21].) However, the entirety of the email sent by Ms. Shamsid-deen on February 14, 2009, shows that she had made an effort to train Plaintiff how to work safely on the APPS machine, that she had concerns regarding making sure he was not further injured in light of his prior injuries and medical restrictions, and that she was attempting to sort out the various issues and claims raised by Plaintiff, including his union grievances, prior Department of Labor placement, and current Modified Duty Requests.[12]

In his Response Brief, Plaintiff also alleges that Ms. Shamsid-deen retaliated against him based on his first EEO Complaint by not approving his leave requests in early 2009. (Pl. Dep. at 130 [Doc. #27-3 at 26].) Plaintiff testified that Ms. Shamsid-deen would "disapprove most of" his requests for leave after his EEO filing. (Id.) However, Plaintiff has failed to submit any evidence to show any causal link between his EEOC complaint and the denial of leave. At most, Plaintiff's evidence instead indicates that Ms. Shamsid-deen refused to approve leave requests if he did not provide medical documentation. A requirement of medical documentation to

_____

[12] To the extent the e-mail includes a reference to Plaintiff being "out the door," the evidence indicates that Plaintiff's prior Limited Duty position was subject to the National Reassessment Process, which Plaintiff avoided by returning to Regular Duty, as noted above. This Court concludes that while the e-mail may have included a poor choice of words, the e-mail itself does not provide sufficient evidence to create a genuine issue of disability discrimination or retaliation, where the undisputed evidence reveals multiple attempts to provide Plaintiff with Light Duty options, and where the ultimate failure to provide Plaintiff with the accommodation he requested was simply due to the terms of the collective bargaining agreement and the lack of full-time forklift work at Plaintiff's grade level consistent with that agreement.

support ongoing leave requests, or an occasional denial of leave requests, would not constitute an adverse retaliatory action. See Mackenzie v. Potter, 219 F. App'x 500, 503 (7th Cir. 2007) (no adverse employment action under Title VII when employer denied occasional requests for leave); see also Pueschel v. Peters, 340 Fed. App'x 858, 861 (4th Cir. 2009) (applying same standard for materially adverse action which constitutes retaliation under both Title VII and the Rehabilitation Act). Moreover, Defendant notes that it was standard policy to require medical documentation for absences in excess of three days. (Def. Mem. Ex. D.22 [Doc. #27-35].) Therefore, the Court concludes that Plaintiff has failed to present evidence to establish a claim for retaliation in violation of the Rehabilitation Act.

D.     Constructive Discharge

Finally, Plaintiff claims that he was forced to retire as a result of not being accommodated on his medical impairments. Initially, the Fourth Circuit has cautioned against finding a constructive discharge upon the premise that the employer failed to afford the plaintiff reasonable accommodation. Johnson v. Shalala, 991 F.2d 126, 131-32 (4th Cir. 1993). "The consequences of regarding every failure to accommodate an employee as a constructive discharge would be significant." Id. at 131. Therefore, even if accommodations offered to the employee fail to satisfy the requirements of the Rehabilitation Act, the employee still must present evidence that the employer intentionally sought to drive him from his position. Id. at 132.

In this case, it is undisputed that Plaintiff applied for and was granted disability retirement in 2009. (Def. Mem. Ex. F.6 [Doc. #27-58].) In his September 1, 2009 application for disability

retirement, Plaintiff stated that he became disabled in January 2009. (Id., Ex. F.5.) In an October 2009 EEO Investigative Affidavit, Plaintiff stated that his retirement was "voluntary." (Id. Ex. H [Doc. #27-61] ¶ 12.) The statements that Plaintiff cited in that affidavit regarding management's actions were that: (1) on April 6, 2009, Keith Lawrence told him that he would "never be able to drive the forklift and that if [Plaintiff] retired on disability that [he] would make more money;" and (2) that on the same date Keith Lawrence told him that he "better start thinking outside the box." (Id., ¶¶ 10-11.) In its final agency decision, the Postal Service determined that Plaintiff had not presented sufficient evidence to show that he was "forced" to retire. (Def. Mem. Ex. E.11 [Doc. #27-51 at 18-19].)

In order to succeed on this claim, Plaintiff must allege and prove deliberateness of the employer's actions, motivated by disability bias, and objective intolerability of his working conditions. See Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 187 (4th Cir. 2004). Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable to make a reasonable person resign. Id. In this case, based on the evidence presented, Plaintiff has failed to create a genuine issue of fact on the objective intolerability of his working conditions or that any actions of Mr. Lawrence were motivated by disability bias. Therefore, to the extent Plaintiff may have asserted a claim for constructive discharge, Defendant's Motion for Summary Judgment should be granted.

III.    CONCLUSION

Defendant should be granted summary judgment on all of Plaintiff's claims.  Given this recommendation, Defendant's Motion to Strike [Doc. #38] will be denied without prejudice.

IT IS THEREFORE RECOMMENDED that Defendant's Motion for Summary Judgment [Doc. #26] be GRANTED, and that this action be DISMISSED.

IT IS ORDERED that Defendant's Motion to Strike [Doc. #38] is DENIED without prejudice.

This, the 21st day of February, 2013.

                     /s/   Joi Elizabeth Peake
                    United States Magistrate Judge